# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

CG SCHMIDT INC.,

                Plaintiff,

v.

PERMASTEELISA NORTH AMERICA,

                Defendant.

Case No. 14-CV-1553-JPS

ORDER

On December 15, 2015, the plaintiff, CG Schmidt, Inc. ("CGS"), filed a breach of contract claim and promissory estoppel claim against the defendant, Permasteelisa North America ("PNA"). (Docket #1). The allegations in the complaint tell the classic trilogy of a general contractor and subcontractor relationship gone wrong: a bid, ensuing negotiations, and disengagement. PNA moved for summary judgment on both claims asserted against it on August 3, 2015. (Docket #16).[1] As will be discussed more fully below, the Court finds that the undisputed facts entitle PNA to judgment as a matter of law on both the breach of contract and promissory estoppel claims. Thus, the Court will grant PNA's motions for summary judgment.

## 1. BACKGROUND

The facts in this case are largely undisputed.[2] CGS is a general contractor managing a portion of the construction of a mixed-use, eighteen-

---

[1] While CGS did not formally move for summary judgment, it highlighted in its brief the authority of the Court under Federal Rule of Civil Procedure 56(f)(1) to *sua sponte* "grant summary judgment for a nonmovant." (Docket #23 at 4). As there is no genuine issue of material fact for trial on CGS's claims, the Court finds it unnecessary to decide this case on the basis of Rule 56(f)(1).

[2] The undisputed facts are taken from the parties' proposed findings of fact (*See* Docket #18, #22). The Court will note any disputes of fact, or properly made objections, as they arise. (*See* Docket #21, #26).

story office building located at 833 East Michigan Street, Milwaukee, Wisconsin; a project valued at nearly $52 million. (Docket #18 ¶ 3; Docket #24 Ex. 3 at 22:20-24, 70:17-18). PNA is part of an international conglomerate of subcontractors that participates in various architectural engineering projects, including the custom design, manufacture, and installation of unitized curtainwalls.[3] (Docket #19 at 2; Docket #24 Ex. 10 at 36:22-37:22). The following events took place over the course of approximately fourteen months, from April of 2013 through June of 2014. (Docket #18 ¶¶ 10,12, 77-79).

## 1.1. The Bid

The relationship between CGS and PNA began in April of 2013, when CGS began to solicit subcontractor bids for a custom curtainwall on its 833 East Michigan Street Project (the "Project"). (Docket #18 ¶ 10; Docket #22 ¶ 3). The curtainwall was slated to be one of the largest subcontracts for the development. (Docket #18 ¶ 8). To guide the bidding process, CGS provided prospective subcontractors a number of documents, including its Contract Manual (the "Manual") and a Draft Schedule. (Docket #15 Ex. 1 at 3, 11; Docket #18 ¶ 10; Docket #22 ¶ 3). The Manual contained instructions to bidders on the logistics of bid submission, blank bid forms, work category descriptions, and numerous agreement forms, which included CGS's blank, standard subcontract and exhibits. (Docket #15 Ex.1 at 13-14; Docket #18 ¶ 10; Docket #22 ¶ 3). In relevant part, the standard subcontract stated:

---

[3] A unitized curtainwall is a "preassembled, prefabricated unit" (Docket #24 Ex. 10 at 14:5-11) that covers the exterior of a building for purposes of weatherproofing and aesthetics. (Docket #23 at 1 n. 1).

The Contract between CGS and the Subcontractor includes all the terms and conditions of this Subcontract and its Exhibits…and all the terms and conditions of the Agreement between CGS and the Project Owner (the "Prime Agreement")…applicable to the Subcontractor's Work…(collectively, the "Subcontract Documents").[4] The Subcontract Documents form the entire and integrated agreement between the parties and supersede all prior bidding, proposals, negotiations and/or agreements, written or oral, between Subcontractor and CGS, except to the extent expressly referenced in these Subcontract Documents.

(Docket #15 Ex. 1 at 74).

PNA submitted its bid to furnish, fabricate, and install a custom curtainwall for the Project on April 19, 2013. (Docket #18 ¶ 11; Docket #15 Ex. 2). As instructed, PNA used the bid form provided in CGS's Manual. (Docket #15 Ex. 2). PNA's legal team reviewed the bid, and PNA's Senior Vice President, Michael Kneeland, signed it. (Docket #22 ¶¶ 9, 17). The bid stated, in relevant part:

The Bidder…hereby proposes to furnish all labor, materials, tools, equipment…and to construct all work in the Work Category in accordance with the Contract Drawings and Specifications…and CG Schmidt Contract Manual dated March 22, 2013 for the bid amount stated in this document….The

_____

[4]The "Subcontract Documents" referenced in CGS's standard subcontract are more fully defined as,

all the terms and conditions of this Subcontract and its Exhibits; the Project general, supplemental and any special conditions; the Project design drawings, specifications and all addenda issued prior to the date of this Subcontract; and all the terms and conditions of the Agreement between CGS and Project Owner (the "Prime Agreement") applicable to the Subcontractor's Work, including, but not limited to, any Contract Documents identified in that Prime Agreement; and the Project Manual.

(Docket #15 Ex. 1 at 74).

> Bidder, if awarded a contract, agrees to commence work and to fully complete this Work Category in accordance with a schedule to be established in collaboration with CG Schmidt….

(Docket #15 Ex. 1 at 19). The bid added that, "[t]he Bidder agrees that his/her Base Bid shall be good and may not be withdrawn for a period of one hundred twenty (120) calendar days after the bid opening date." (Docket #15 Ex. 2 at 2).

CGS's bid form also required PNA to submit information related to its price estimate, alternative fee proposals, insurance coverage, and resident- and race-based employment practices. (Docket #15 Ex. 2 at 2-5). Attached to its bid, PNA, on its own letterhead, submitted a more detailed financial breakdown of its initial proposal for the curtainwall project, which totaled $12,675,421.00. (Docket #15 Ex. 2 at 3). PNA likewise outlined the "scope specifically included" in the curtainwall, various warranties, site logistics, clarifications, and exclusions. (Docket #15 Ex. 2 at 8-11). Within a "couple of months" from the submission of PNA's bid, CGS selected PNA as its subcontractor of choice. (Docket #18 ¶ 18; Docket #24 Ex. 3 at 77:22-78:9).

## 1.2 The Negotiations

Though CGS was "not prepared to write a subcontract" during the spring of 2013, it began "working towards a signed contract" with PNA "based on the award." (Docket #18 ¶ 19; Docket #24 Ex. 3 at 79:18-80:6). The parties waited to sign a subcontract for two primary reasons.

First, CGS had not yet entered into two important agreements with the Project's owner: the "prime contract" and an important corollary thereto,

known as the Guaranteed Maximum Price Amendment ("GMPA").[5] (Docket #18 ¶¶ 27-28, 34-41; Docket #22 ¶ 24). CGS followed industry practice insofar as it maintained a general policy of signing written agreements with all of its subcontractors. (Docket #18 ¶ 2). But, it could not proceed to sign a contract with PNA until it signed the prime contract and GMPA.[6] (Docket #18 ¶ 34-41; Docket #22 ¶¶ 1-3, 53; *see also* Docket #24 Ex. 3 at 62:25-63:5). By the same token, CGS does not dispute that, as a general matter of good business practice, it does not execute subcontracts until it first executes a prime contract with a project owner. (Docket #18 ¶ 40).

Second, immediately after the award of the curtainwall project to PNA, the parties actively engaged in refining various aspects of their agreement. (Docket #18 ¶¶ 12-15, 21-23, 46-48). CGS was particularly interested in reducing the proposal's cost and, as a result, PNA issued a series of revised proposals in order to save CGS money. (Docket #24 Ex. 3 at 31:7-32:12, 71:25-72:16). The specific requests made by CGS during this "value engineering process" primarily centered on cost-saving "alternate" materials

---

[5] According to the deposition of Mikelis Abuls, the Executive Vice President and Chief Operating Officer for CGS (Docket #24 at 1; Docket #24 Ex. 1 at 21:19-22:3), the GMPA acts as a sort of financial reserve if a particular aspect of the construction project exceeds the contract price, such as what might occur in the event of a "contingency," like weather, or other "potential gaps." (Docket #24 Ex. 1 at 41:22-42:18).

[6] The GMPA would, in turn, enable CGS to "lock[] in the Project pricing" between CGS and PNA. (Docket #22 ¶ 53). In essence, the parties describe that without the GMPA to set the overall budget, CGS could not set the subcontractors' budgets.

and the proposed contract scope.[7] (Docket #18 ¶¶ 12-14; Docket #24 Ex. 2 at 75:16-76:23).

Beyond refining the financial aspect of their agreement, as early as May 10, 2013, PNA forwarded various comments (the "May 2013 email") to CGS from its legal department about CGS's standard subcontract. (Docket #18 ¶ 15). Mr. John Stanko ("Stanko")[8] related that, "[b]ecause we have not yet had an opportunity to review the prime contract, which is referenced in the subcontract,[9] we do not believe it would be constructive to initiate discussion on the subcontract, but look forward to discussing the documents' terms in the near future." (Docket #18 ¶ 15). Moreover, PNA expressed specific concerns related to the order of precedence of documents, remedies for nonpayment, compensation terms, damage liability, and bonds. (Docket #18 ¶ 15).

Despite these two roadblocks, during the spring and summer of 2013, PNA and CGS continued to discuss other matters related to the curtainwall. For example, at one point, PNA offered a "design assist" service to advise CGS, the architect, and the developer in managing the curtainwall's

---

[7]To be clear, CGS disputes that the parties were actively negotiating the "essential terms and conditions of the scope of work," which it argues were established over the course of the parties' fourteen-month exchange of the bid packet, revised bids, letters of intent, and an updated bid proposal. (Docket #21 ¶ 59).

[8]Mr. Stanko is a former employee of PNA and was CGS's frequent contact. (Docket #24 Ex. 2 at 16:24-17:4, 47:12-16).

[9]CGS's standard subcontract incorporates the prime contract by reference. (Docket #15 Ex. 1 at 74) ("The Contract between CGS and the Subcontractor includes all the terms and conditions of this Subcontract and its Exhibits…and all the terms and conditions of the Agreement between CGS and the Project Owner….").

installation, which CGS declined. (Docket #22 ¶ 26). In addition, continuing into June of 2013, the parties met with the developer and the architect to discuss a number of construction related issues, including, but not limited to, the budget, systems performance, and installation. (Docket #22 ¶ 28).

In September of 2013, the parties continued their discussions about the subcontract's terms. Specifically, on September 12, 2013, CGS provided PNA an updated version of CGS's standard contract. (Docket #18 ¶ 20).[10] CGS expressed interest in "discuss[ing] any concern such as those attached using the actual contract language as the basis." (Docket #18 ¶ 20). In response, PNA echoed the request made in its May 2013 email to view the terms of the prime contract. (Docket #18 ¶ 20). PNA likewise provided CGS an updated list of particular concerns related to the terms of CGS's subcontract and the prime contract.[11] (Docket #18 ¶¶ 22-23).

_____

[10]The parties do not discuss, nor does deposition testimony confirm, the manner in which this subcontract was "updated" from CGS's standard subcontract that appeared in the Manual. (Docket #18 ¶ 20; Docket #24 Ex. 3 at 140:1-24).

[11]The parties do not explain the basis of PNA's comments regarding the prime contract, as PNA did not receive a copy of the prime contract between CGS and the Project owner until May 29, 2014. (Docket #18 ¶ 49). Regarding the subcontract, the terms that PNA was primarily concerned with centered around liability, damages, compensation for delay, and other payment related terms. (Docket #18 ¶ 23). Within the context of the prime contract, PNA wanted to address document precedence, compensation for delay, mark up on change orders, and bonds. (Docket #18 ¶ 23).

Discussions about the manufacturing aspect of the curtainwall also occurred in September of 2013. (Docket #22 ¶ 29).[12] At this point, PNA was "prepar[ing] itself" for the proposed use of its Global Architectural Technologies ("GAT II") (Docket #24 Ex. 10 at 115:21-116:2) facility in Thailand for fabrication of the curtainwall. (Docket #22 ¶ 29). The reason behind pursuing production at GAT II was that, if the materials were made in Thailand, as opposed to the United States, PNA would be willing to offer a financial credit, or "deduct," towards the subcontract price. (Docket #24 Ex. 10 at 116:15-117:11; Docket #22 ¶ 29(a)).

From about late 2013 through 2014, construction was delayed. (Docket #18 ¶ 37; Docket #24 Ex. 2 at 85:14-86:5). At this time, however, CGS's "project team" suggested to PNA that it wanted to move forward with certain "engineering activities" in order to keep on track with the overall schedule. (Docket #24 Ex. 2 at 89:8-90:3). PNA advised that, in order to "devote those resources," PNA "need[ed] some sort of financial commitment" and either a subcontract agreement or letter of intent. (Docket #22 ¶ 33). In response, CGS issued an unsigned letter of intent ("February LOI") for PNA's review and comment. The February LOI explained, "[i]n accordance with our discussions to date, it is the intent of CG Schmidt, Inc. and Permasteelisa North America to enter into a Subcontract agreement

---

[12]While the parties' briefs and findings of fact do not specifically address when conversations regarding manufacture of curtainwall components in Thailand began, the bid does reference under the "Alternates" section a "Unitized Curtainwall Alternate Procurement Model - Thailand." (Docket #15 Ex. 2 at 7). In addition, according to Kneeland, the "opportunity" for CGS and PNA to work together on the Project was first discussed in 2012. (Docket #24 Ex. 10 at 30:17-32:3). However, no "specifics of the [2012] conversation," such as the idea of manufacturing at PNA's GAT II facility in Thailand, came to light in the testimony. (Docket #24 Ex. 10 at 31:22-23).

Case 2:14-cv-01553-JPS    Filed 10/23/15    Page 8 of 48    Document 28

relative to the above referenced project." (Docket #18 ¶ 24). It likewise contained an integration clause stating, "[u]pon execution of the Subcontract …the Subcontract and its Exhibits shall supersede in all respects prior negotiations between CG Schmidt, Inc. and Permasteelisa North America, including this letter of intent." (Docket #18 ¶ 24). Furthermore, the February LOI set forth: (1) a proposed scope of contract with certain alternates that CGS could select from at a later date; (2) a list of items PNA would provide for the curtainwall; and (3) a "Total Contract" price of $7,744,469.00. (Docket #22 ¶ 34; Docket #24 Ex. 21 at 2-3). The parties made no financial commitments at this time. (Docket #24 Ex. 21). Neither party signed the document. (Docket #18 ¶ 24).

In response to the February LOI, on March 5, 2014 (the "March 2014 email"), PNA provided CGS with "comments related to [the] schedule and associated costs until a contract [could] be finalized." (Docket #15 Ex. 9 at 1; *see also* Docket #18 ¶ 25). Within the schedule portion of the March 2014 email, PNA lists a date for a "Design kickoff [meeting] with Kahler Slater."[13] (Docket #15 Ex. 9 at 1). The other curtainwall project deadlines listed in the March 2014 email relate to: shape drawing approval; shop drawing approval; finalization of details; production and procurement of materials; fabrication; assembly; shipping; delivery; and installation. (Docket #15 Ex. 9 at 1-2). PNA noted in its email, however, that "[a]n executed contract will need to be in place…for us to proceed with the project" before the "7/4 [s]hop [d]rawing submittal" deadline. (Docket #15 Ex. 9 at 1; *see also* Docket #18 ¶ 25). With regard to the schedule, PNA highlights that, "[o]ur bid schedule shows a 6 month duration for installation. LOI defines a 3 month duration. Further

---

[13]Kahler Slater is the architect for the Project. (Docket #24 Ex. 3 at 158:11-12.).

Case 2:14-cv-01553-JPS   Filed 10/23/15   Page 9 of 48   Document 28

discussion will be required for this." (Docket #15 Ex. 9 at 2). Ultimately, according to PNA, the "financial commitment" associated with the initial project schedule totaled $600,000.00. (Docket #22 ¶ 38). The parties do not state that they exchanged any of that money.

Later that month, on March 25, 2014, CGS and PNA, along with the architect, operations, and engineering teams, convened for the scheduled "kick-off" meeting. (Docket #22 ¶ 40-40(a)). PNA admits that it does not usually participate in "kick-off" meetings unless it is "under contract," but Mr. Stanko testified that PNA did so for the curtainwall project because it was "very close to getting this thing up and running." (Docket #24 Ex. 2 at 120:10-121:22).

Meanwhile, beginning in approximately February of 2014, PNA began to have internal concerns about the availability of GAT II for the Project. (Docket #22 ¶ 32). On the one hand, PNA was concerned that a crucial operations employee, Michele, would be unavailable to run the facility. (Docket #22 ¶ 32). An internal email exchange in mid-February between PNA executives discussing Michele's situation conveyed concern when sharing this issue; "Houston, we have a problem." (Docket #22 ¶ 32; Docket#24 Ex. 20). However, the same email also lays out the possibility of potentially conducting manufacture in Manila or "increas[ing] the team at GAT." (Docket#24 Ex. 20). On the other hand, PNA's assembly plant manager in Chicago stated in an email to another PNA employee that he "hope[d] you know what you are doing on this one" after being informed that "the GAT2 budget [was] just approved, [and] end of the year start assembly [was] a perfect timing." (Docket #22 ¶ 32(a); Docket #24 Ex. 19 at 1). It is unclear, and the parties do not address, whether this email exchange in any way related to the availability of Michele.

Approximately one month after the "kick-off" meeting, on April 21, 2014, CGS and the Project owner executed the prime contract. (Docket #18 ¶ 27). The signing of this agreement between CGS and the Project owner spurred rapid fire communications between the parties regarding the subcontract and project developments.

First, PNA provided CGS with "preliminary shape approval" drawings[14] and an "initial [] cost breakout," setting forth the manner in which PNA would invoice the initial $600,000.00 financial commitment through July of 2014. (Docket #22 ¶ 41-42; Docket #24 Ex. 25 at 2). Despite the submission of preliminary shape drawings, PNA communicated that it could not order "mockup materials" until it had "an executed LOI in hand." (Docket#22 ¶ 43; Docket #24 Ex. 26 at 1-2). Thus, on May 23, 2014, CGS issued a signed letter of intent ("May LOI") to PNA in an email titled "Revised Notice to Proceed." (Docket #22 ¶ 48).

The May LOI from CGS was similar in overall structure to the February LOI, but the two documents differed in various aspects. On the one hand, the LOIs were identical insofar as they expressed the same "intent…to enter a Subcontract," the same integration clause, and listed the same contract price of $7,744,469.00. (Docket #22 ¶ 50). On the other hand, the May

---

[14]The parties dispute whether PNA generally begins preliminary shape drawings before payment. (Docket #26 ¶ 41(a); *compare* Docket #24 Ex. 10 at 17:7-19 *with* Docket #24 Ex. 2 at 170:16-171:2). However, this fact is immaterial. Even assuming that PNA generally does not begin preliminary shape drawings until payment is made, the parties do not dispute that a financial commitment was set forth in the LOIs. Moreover, the critical date in this preliminary negotiation process was not the shape drawing deadline, but rather the *shop* drawing submittal date. (Docket #15 Ex. 9 at 1; *see also* Docket #18 ¶ 25, 64). It is undisputed that PNA would not proceed with construction, by submitting shop drawings, until a contract was executed. (Docket #15 Ex. 9 at 1; *see also* Docket #18 ¶ 25).

Case 2:14-cv-01553-JPS   Filed 10/23/15   Page 11 of 48   Document 28

LOI added four "alternate" curtainwall materials to "remain valid through the shop drawing period" and explained the manner in which the "[i]nitial project costs included in the lump sum [would] be billed." (Docket #24 Ex. 4 at 2-3). The May LOI also pushed back the timeline for various project dates. (*Compare* Docket #24 Ex. 21 at 2 *with* Docket #24 Ex. 4 at 2). PNA never signed the May LOI. (Docket #18 ¶ 33).

At about the time CGS delivered the May LOI, PNA's Executive, Mr. Kneeland, was working in PNA's Thai office. (Docket #22 ¶ 44). During his stay, a martial law curfew went into place and, in light of the political unrest in the country, Mr. Kneeland left the country immediately. (Docket #22 ¶ 44). Mr. Kneeland admits that as of May 22, 2014, he was aware that the curfew in that country was causing interruptions at the GAT II facility. (Docket #22 ¶ 45). He did not communicate this information to Mr. Stanko. (Docket #22 ¶ 46).

Less than a week after CGS sent the May LOI to PNA, CGS entered into the GMPA with the Project owner. (Docket #18 ¶ 34). At this time, PNA emailed CGS three glass sample options (Docket #24 Ex. 30 at 1; *see also* Docket #22 ¶ 56) and provided CGS with an Updated Bid Proposal, which raised the curtainwall project price to $8,462,016.00. (Docket #22 ¶ 54; Docket #24 Ex. 29 at 2).

CGS provided PNA with a copy of the prime contract on May 29, 2014. (Docket #18 ¶¶ 48-49). In response, Mr. Stanko reiterated to CGS, by telephone, PNA's concern with liquidated damages, stating that they were "not acceptable." (Docket #24 Ex. 10 at 106; Docket #18 ¶ 53). CGS acknowledged, in an internal email, that PNA had an "issue with the open ended LD's [liquidated damages]" and "a couple other small areas of concern." (Docket #18 ¶ 52). Addressing these and other matters, Mr. Stanko

wrote in an email to CGS on June 3, 2014 (the "June 2014 email"), that "[i]t would be a good time to start reviewing the scope specific portion of the contract…." (Docket #18 ¶ 56). Mr. Stanko's email also highlighted issues that PNA had with "delay damages," "our ability to be compensated for delay," and "other issues" if his "assumption about flow down language [in the draft subcontract was] incorrect." (Docket #18 ¶ 44). Attached to the June 2014 email was a one-page document with proposed subcontract language regarding "Liability for Delay Damages" and "Damages for Delay by Others."[15] (Docket #18 ¶ 55). By this point, according to CGS's internal emails, it became "very important to have the contract [with PNA] signed and sealed by the end of next week at the latest." (Docket #18 ¶ 57).

Following up on PNA's concerns over the project scope and damage liability, CGS forwarded a proposed scope for inclusion in the subcontract on June 5, 2014. (Docket #18 ¶ 60). This attached draft statement of the proposed scope of work also included a contract price of $7,824,529.67. (Docket #18 ¶ 61). In addition, CGS furnished language for a proposed addendum to address PNA's exposure to delay damages. (Docket #18 ¶ 63).

Internally, CGS's executives exchanged emails expressing concern that PNA had not begun "shop drawings" for the Project. (Docket #18 ¶¶ 64-65). One of CGS's internal emails reflects on a conversation between PNA and CGS in which PNA explained that it could not "start shop drawings…[due to] a number of contract issues to which only two have been answered. They [PNA] are holding the shape redone shops as hostage to the contract."

_____

[15]PNA's internal emails reflect the fact that the company would "not allow us to sign a contract without some limits on delay damages." (Docket #15 Ex. 16 at 1). Moreover, PNA's concern with compensation for delay arose out of the fact that PNA did not have available "contingency funds," and would thus be "without a remedy in the event of a delay caused by another party." (Docket #15 Ex. 16 at 2).

(Docket #18 ¶ 64). Moreover, a CGS Executive pressed that, "I need to get a contract out soon to remove that excuse for them." (Docket #18 ¶ 65).

Ultimately, on June 13, 2014, CGS emailed PNA a proposed subcontract for electronic signature ("June 13 subcontract"). (Docket #18 ¶ 66). The price on the agreement was listed as $7,797,464.00. (Docket #18 ¶ 67). PNA did not sign the June 13 subcontract. (Docket #18 ¶ 68). Three days later, on June 16, 2014, CGS emailed a revised proposed subcontract to PNA, this time listing the agreement's price at $7,751,916.00 ("June 16 subcontract"). (Docket #18 ¶¶ 70-71). Again, PNA did not sign the June 16 subcontract. (Docket #18 ¶¶ 72).

At this point, CGS still had not yet cleared PNA's "pre-qualification" form, which, according to CGS policy, is required before a subcontract is signed by CGS. (Docket #18 ¶ 50; Docket #24 Ex. 14 at 105:8-23).

### 1.3    The Disengagement

On or about June 16, 2014, PNA communicated by telephone and letter that it was "disengaging" from the curtainwall project. (Docket #18 ¶¶ 73, 76-77). PNA's explanation was that civil unrest in Thailand limited its production capability and, as such, "a production slot no longer exist[ed] to accommodate the revised construction schedule" on the Project. (Docket #22 ¶¶ 65-66(a)). At no time did PNA warn CGS that it would be backing out of the fabrication and installment of the curtainwall. (Docket #22 ¶ 62). The parties had not signed a subcontract. (Docket #22 ¶ 81).

Following PNA's disengagement, CGS hired another contractor, Glass Solutions, to complete the curtainwall project. (Docket #18 ¶ 83). CGS alleges that Glass Solutions agreed to an "accelerated schedule and installation costs in amounts excess to PNA's most recent proposal and which form the basis of this claim." (Docket #22 ¶ 68). The Court quotes directly from CGS's

proposed finding of fact because CGS did not provide any factual support from the record to support the substance of its finding. (Docket #22 ¶ 68). According to a CGS executive, "the contract amount [for the replacement subcontractor] won't be finalized until the work is complete…." (Docket #24 Ex. 1 at 64:10-21). Moreover, CGS apparently expects to use the contingency fund established under the GMPA to cover some or all of the curtainwall in excess of its original budget. (Docket #24 Ex. 1 at 43:17-61:25).

2.      SUMMARY JUDGMENT STANDARD

When a party files a motion for summary judgment, it is their "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat. Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to have a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 586 (1986); namely, the party in opposition "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

When analyzing whether summary judgment should be granted, a court must draw all reasonable inferences from the materials before it in favor of the non-moving party. *Hotel 71 Mezz*, 778 F.3d at 603. When a court denies a motion for summary judgment it "reflects the court's judgment that

one or more material facts are disputed or that the facts relied on by the motion do not entitle the movant to judgment as a matter of law." *Id.* at 602.

3.      ANALYSIS

   3.1      CGS and PNA Intended to Be Bound To A Fully Integrated and Superceding Subcontract, Which Was Never Signed

PNA argues that there is no genuine issue of material fact regarding CGS's breach of contract claim, and as such it is entitled to judgment as a matter of law under Rule 56. The gravamen of PNA's argument is that the parties intended to sign a subcontract and that, unless and until a subcontract was signed, neither party owed a binding obligation to the other. (*See generally* Docket #19). According to PNA, because no subcontract was ever signed by the parties, PNA was free to disengage from the curtainwall project and did not breach any contract. (*See* Docket #19).

On the other hand, CGS argues that, under the Uniform Commercial Code ("UCC" or "the Code"), the contract formation standards are more liberal. (*See* Docket #23). Under the UCC, a binding agreement could be, and according to CGS's account was, formed, even in the absence of a signed subcontract. (*See generally* Docket #23). On this ground, CGS argues that not only was there a contract between CGS and PNA, but there were four contracts that formed over the course of the parties' fourteen-month interaction. (*See* Docket #23). These contracts were in turn based on the terms of: (1) the bid award; (2) the May LOI, (3) PNA's Updated Bid Proposal; and (4) the June subcontracts. (*See* Docket #23 at 8-12).

The Court concludes that the parties never manifested an intention to be bound to any of the bids, LOIs, or proposed subcontracts that the parties exchanged from April of 2013 until June of 2014. Rather, the documents, communications, and circumstances of CGS and PNA reveal that they

intended to create a subcontract that would supercede and integrate all prior negotiations. Because CGS and PNA never executed the contemplated subcontract, CGS's breach of contract claim must fail as a matter of law.

### 3.1.1  Applicable Law

In Wisconsin,[16] contracts for the sale of goods are governed by the Uniform Commercial Code. Wis. Stat. § 402.102. "Goods" are defined under the Code as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." Wis Stat. § 402.105. Though PNA did not address whether the UCC applies in its briefs, CGS argued in its response brief that the Code should govern this matter because the alleged contract was for the sale of a "good," *i.e.,* a curtainwall, and its component parts. (*See* Docket #19, #21, #25). Beyond this cursory reference, however, CGS failed to provide the Court with a thorough analysis of why the Code, instead of the common law, controls. (*See* Docket #21). The Court, for the sake of completeness, must address whether the UCC governs.

In Wisconsin, determining whether the UCC applies to a mixed contract, *i.e.,* a contract for the sale of goods and services, is guided by the

---

[16]Though the parties do not dispute the application of Wisconsin law, the Court, when sitting in diversity, must apply the choice of law principles of the forum state to determine what substantive law governs the proceedings. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006). In contract matters such as this one, the Wisconsin Supreme Court utilizes a "grouping-of-contacts approach," as embodied in the Restatement (Second) of Conflicts. *Sybron Transition Corp. v. Sec. Ins. Co. of Hartford*, 107 F.3d 1250, 1255 (7th Cir. 1997) (citing *Urhammer v. Olson*, 39 Wis.2d 447, 159 N.W.2d 688 (1968)). In this case, the alleged agreement was being negotiated by a Wisconsin plaintiff who sought contract work for real property that is likewise located in Wisconsin. (*See* Docket #1). Thus, because the contract in dispute has the most "significant relationship" with Wisconsin, Wisconsin law governs. *See In re Jafari*, 569 F.3d 644, 649 (7th Cir. 2009).

"predominant purpose" test. *Linden v. Cascade Stone Co.*, 2005 WI 113, ¶ 8, 283 Wis. 2d 606, 614, 699 N.W.2d 189, 193 ("We conclude that the totality of the circumstances test, which includes both quantitatively objective and subjective factors, should be applied to determine the predominant purpose of a contract."). Courts analyze various objective and subjective factors in determining the "predominant purpose" of an agreement, such as: (1) the language of the contract; (2) the nature of the business of the supplier; (3) the intrinsic worth of the materials; (4) the circumstances of the parties; and (5) the primary objective they hoped to achieve by entering into the contract. *Id.* This totality of the circumstances test is ultimately aimed at determining whether the parties' "predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved…or is a transaction of sale, with labor incidentally involved…." *Van Sistine v. Tollard*, 95 Wis. 2d 678, 685, 291 N.W.2d 636, 639 (Ct. App. 1980).

Applying the *Linden* factors*,* the Court finds that the thrust of the parties' negotiations related to the sale of goods. In reference to the first factor, while the Court notes that a principle aspect of this case centers on determining whether there even was a contract between the parties, various writings described the curtainwall. For example, on PNA's bid under the "Price Schedule," PNA lists the proposed prices of various materials, including a unitized curtain wall, punched openings, metal panels, exterior glass handrails, entry doors, a revolving door, and a cable net wall. (Docket #15 Ex. 13 at 7). Nowhere in this itemized list does it detail the cost of labor or installation services. (Docket #15 Ex. 13 at 7). Thus, with regard to the first factor, it appears that the parties ultimately negotiated with the value of materials, or goods, in mind. Similarly, under the third factor, the bid seems to indicate that the intrinsic worth of the curtainwall materials far

outweighed any potential charges PNA would have made to CGS for its installation.

With regard to the second factor, although PNA, the "seller" in this case, does not explicitly describe the nature of its business, according to PNA's brief, the dispute in this case arose out of PNA's award to "furnish, custom fabricate, and install" a curtainwall. (Docket #19 at 2). In addition, PNA's initial bid for the curtainwall described the "scope" of the project as the "engineering, material, fabrication, assembly, and erection of a custom unitized curtainwall, [and] Project management." (Docket #15 Ex. 13 at 7). Thus, the second factor weighs equally in favor of either a contract for goods or services.

With regard to the fourth and fifth factors, the circumstances and ultimate objective of CGS and PNA are largely analogous to that which occurred in *Linden*. In that case, the Wisconsin Supreme Court concluded that a contract between a home buyer and various contractors was predominantly for the sale of a house and its component parts, rather than one for services. *Linden*, 2005 WI 113, ¶ 25. Similar to the contract in *Linden*, PNA's bid references both goods, such as the curtainwall, doors, handrails, panels etc., and services, such as engineering and installation. (Docket #15 Ex. 13). However, as in *Linden*, PNA's bid was provided as a *fixed* cost and does not appear to have been designed to change based on the hours worked. *Id.* (Docket #15 Ex. 13 at 7). As such, PNA and CGS appear to have been bargaining for a price based on the specifications of the curtainwall, and not the amount of work put into "installation" or "engineering." (Docket #15 Ex. 13 at 7); *see also Linden*, 2005 WI 113, ¶ 25.

In conclusion, under the Wisconsin Supreme Court's "totality of the circumstances" test, the Court concludes that the predominant purpose

of PNA and CGS's proposed agreement was for a product, namely, a curtainwall, rather than one for services. As such, the UCC governs this case.

### 3.1.2   Foundational Principles of Contract Law

The elements of an enforceable contract are a valid offer, acceptance, and bargained for consideration. *Runzheimer Int'l, Ltd. v. Friedlen*, 2015 WI 45, 362 Wis. 2d 100, 862 N.W.2d 879. "The existence of an offer and acceptance are mutual expressions of assent, and consideration is evidence of the intent to be bound to the contract." *Id.* (internal citations omitted). Under Wisconsin law, "[t]he essence of a contract is that the minds of the parties thereto must meet on the same thing." *Zuelke v. Gergo*, 258 Wis. 267, 271 (1951). But, "[t]here is no meeting of the minds where the parties do not intend to contract." *Novelly Oil Co. v. Mathy Const. Co.*, 147 Wis. 2d 613, 433 N.W.2d 628 (Ct. App. 1988) (internal citations omitted).

Because the UCC does not define the term "offer," the Court must look to the common law of contracts. *Rich Prods. Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 956 (E.D. Wis. 1999) *aff'd*, 241 F.3d 915 (7th Cir. 2001).  In Wisconsin, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Id.* (citing Restatement (Second) of Contracts § 24 (1979)). Under the Code, "[u]nless otherwise unambiguously indicated by the language or circumstances…[a]n offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." Wis. Stat. § 402.206(1)(a).

Unlike the common law, acceptance of an offer under the UCC is treated more liberally. *Architectural Metal Sys., Inc. v. Consol. Sys., Inc.*, 58 F.3d 1227, 1229 (7th Cir. 1995). Under Wis. Stat. § 402.207(1), a "definite and seasonal expression of acceptance" may "operate[] as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." In the spirit of reducing formalistic constraints on contract formation, the UCC makes explicit that "[c]onduct by *both* parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract." Wis. Stat. § 402.207(3) (emphasis added). Ultimately, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Wis. Stat. § 402.204(1).

The notion that parties may become bound by contact in the absence of a "mirror image" response, and indeed without a writing at all, is accepted by Wisconsin courts. *See e.g.*, *Chudnow Const. Corp. v. Commercial Disc. Corp.*, 48 Wis. 2d 653, 657, 180 N.W.2d 697, 698 (1970). "It is quite fundamental that parties may become bound by the terms of a contract even though they do not sign it, *where their intention to do so is otherwise indicated.*" *Albright v. Stegeman Motor Car Co.* (1919), 168 Wis. 557, 560, 170 N.W. 951, 952 (emphasis added). Nonetheless, despite its more liberal construction rules, the UCC "does not eliminate the basic requirement of contract law that the

parties in fact reach an agreement." *Novelly Oil Co.*, 147 Wis. 2d at 616 (citing 2 Anderson, Uniform Commercial Code sec. 2–204:18, at 206 (1982)).[17]

The question of the parties' intent to contract is one of fact. *Peninsular Carpets, Inc. v. Bradley Homes, Inc.*, 58 Wis. 2d 405, 413–14, 206 N.W.2d 408, 412 (1973); *see also Novelly Oil Co.*, 147 Wis. 2d at 617 ("While the code empowers courts to declare that a contract has been formed even if certain material terms are left open, we must still make the threshold factual finding that an intent to contract existed.") (internal citations omitted). However, the mere "recitation that 'intent matters' does not on its own call for trial." *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987); *see also Ziolkowski v. Caterpillar Inc.*, 996 F.2d 1220, 2013 WL 230140, at *2 (7th Cir. 1993) ("The intent of the parties to an oral contract is generally a question of fact. It may become a question of law, however, if the facts are undisputed and there can be no difference in the judgment of reasonable men as to the inferences to be drawn from them.") (citing *David Copperfield's Disappearing, Inc. v. Haddon Advertising Agency, Inc.*, 897 F.2d 288, 290 (7th Cir. 1990)).

Under Wisconsin law, the inquiry into the parties' intent to be bound is an objective one. *Associated Milk Producers, Inc. v. Meadow Gold Dairies, Inc.*, 27 F.3d 268, 270-71 (7th Cir. 1994); *see also Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987) ("An intent to be bound by contract does not invite a tour through [the party's] cranium....The status of a document as a

---

[17]The Court notes that *Novelly Oil* was primarily focused on interpretation of a similar UCC provision, Wis. Stat. § 402.204(3). *Novelly Oil Co.*, 147 Wis. 2d at 615-16. While this provision relates more to the situation where a contract has unclear terms, the thrust of the Court's rule, namely that the intent of the parties to contract controls, even under the UCC, remains applicable. *See id.* at 617 (citing *Ginsu Prods., Inc. v. Dart Indus., Inc.*, 786 F.2d 260, 265 (7th Cir. 1986) (interpreting Wis. Stat. § 402.204 generally)).

contract depends on what the parties express to each other and to the world, not on what they keep to themselves."). "Whether the parties intended a binding agreement is determined under the common law of contracts." *Novelly Oil Co.* 147 Wis. 2d at 617; *accord* 2 Anderson U.C.C. § 2-204:70 (3d. ed.).

In the context of contract formation, parties are the "masters of their affairs." *Skycom Corp.*, 813 F.2d at 814. However, agreements to agree are not enforceable in Wisconsin. *Witt v. Realist, Inc.*, 18 Wis.2d 282, 298, 118 N.W.2d 85, 93–94 (1962). Moreover, "[i]t is well settled that no contract is formed where two parties consider the details of a proposed agreement…[with] the understanding during this process that the agreement is to be embodied in a formal written document and that neither party is to be bound until he executes the document." *Gruen Indus., Inc. v. Biller*, 608 F.2d 274, 277 (7th Cir. 1979) (internal citations omitted) (holding that under Wis. Stat. § 402.204, an alleged contract for the sale of stock was invalid because the parties' "conduct was accompanied by statements making it clear that there was no agreement until the negotiations were complete"). In essence, "where, during preliminary negotiations, it is understood that one party is to prepare and present for signature to the other a formal written agreement to evidence the contemplated contract, no contract is entered into unless the written agreement is actually prepared, presented, and signed." *Milwaukee Med. Coll. v. Marquette Univ.*, 208 Wis. 168, 242 N.W. 494, 496 (1932).

### 3.1.3 CGS's Award of the Curtainwall Project Based On PNA's Bid Was An Agreement to Agree to a Subcontract

CGS argues that it is "straightforward" to conclude that: (1) PNA's bid was an offer; (2) CGS's award of the curtainwall project to PNA was an

acceptance; and (3) that the parties' exchange of goods/services for a promise to pay was sufficient consideration to bind them to an agreement. (Docket #23 at 8-9). At first blush, this cut-and-dry recounting of events makes the merits of PNA's motion appear simple to resolve. However, this formulaic recitation of the elements of a breach of contract action misses the forest for the trees. The Court must focus its analysis on determining whether the parties objectively manifested an intent to be bound in order to determine what, if any, contractual obligations CGS and PNA owed to each other. *See Skycom Corp.*, 813 F.2d at 814-15 ("[T]he binding force of a document depends on public or shared expressions. These often will be undisputed, making summary judgment appropriate.").

The first argument CGS makes, without analysis, is that PNA's bid was a valid offer. (Docket #23 at 9). As the UCC does not define the term "offer," Wisconsin courts look to the common law. *Rich Prods. Corp.*, 66 F. Supp. 2d at 956. The principle components of an offer for the sale of goods are the items to be sold, quantity of goods, price, delivery, and payment terms. *Architectural Metal Sys, Inc.*, 58 F.3d at 1227. In essence, the Court must look to whether the terms of the offer appear "complete" so as to justify the offeree's understanding that its assent to the offer will conclude the bargain. *See Rich Prods. Corp.*, 66 F. Supp. at 957.

PNA's bid contained two parts: the first part derived from CGS's Manual and the second part was printed on PNA's letterhead. (Docket #15 Ex. 2). On CGS's form, it stated, "the Bidder propos[ed] to furnish all labor, materials, tools, equipment" and "if awarded a contract, agree[d] to commence work and to fully complete this Work Category....". (Docket #25 Ex. 2 at 2). Thereafter, PNA provided a price list for each aspect of the curtainwall project, including various "alternate" materials for the

construction. (Docket #25 Ex. 2 at 7). PNA also included a proposed "scope" of the proposal. (Docket #25 Ex. 2 at 8). Regarding the project's timeline, the bid states only that PNA would complete the work according to "a schedule to be established in collaboration" with CGS. (Docket #25 Ex. 2 at 2). There are no references to the terms of compensation or delivery.

Whether PNA's initial bid constituted a sufficient offer for the sale of the curtainwall is a close call. At a general level, the parties would have clearly understood that PNA's bid related to a "curtainwall and glazing" job. (Docket #25 Ex. 2 at 3). However, the materials of the curtainwall, and therefore the price associated with it, were not fixed. The itemized price list contained over seven "alternate" materials, totaling over $3,000,000.00, which could have (and indeed, did) dramatically adjust the curtainwall price. (Docket #25 Ex. 2 at 7). As was revealed over the course of the parties' "value design engineering" process, these alternatives, and their corresponding price differentials, were critical in establishing an agreement among the parties. (Docket #18 ¶¶ 13-14, 30, 46). While the project scope provided by PNA (on its own letterhead) does appear fairly specific and detailed on its face, there is nothing in the bid suggesting the timeline for delivery of the goods or the parties' compensation terms. (Docket #25 Ex. 2 at 2-11).

Based on these missing and/or incomplete bid terms, the Court finds it unlikely that PNA's proposal would have reasonably led CGS to conclude that its assent to the bid would "conclude" their bargain. Significantly, CGS's bid form incorporates CGS's Manual by reference. (Docket #15 Ex. 2). The Manual's standard subcontract in turn makes clear that the parties would not be bound by any bids and/or proposals. (Docket #15 Ex.1 at 74). Instead, the Manual's subcontract was clear: the parties would only become obligated to each other once they signed a fully integrated and superseding subcontract.

(Docket #15 Ex. 1 at 74) ("The Subcontract Documents form the entire and integrated agreement between the parties and supersede all prior bidding, proposals, negotiations and/or agreements, written or oral, between Subcontractor and CGS…."). Though it is a close call, the Court concludes that PNA's bid was not an offer.[18]

CGS "awarded" the project to PNA "a couple of months" after its submission. (Docket #18 ¶ 18). However, even assuming that PNA's bid contained sufficient detail to constitute an "offer,"[19] the Court concludes that CGS's award of the project did not bind the parties. This is because: (1) the parties expressly contemplated that the subcontract would form the final expression of their bargain and supersede all prior bidding, proposals, and negotiations; and (2) the parties' conduct did not "recognize[] the existence

---

[18]Related to the bid, CGS also appears to argue, in the context of its promissory estoppel claim, that even if PNA and CGS never signed a subcontract, the parties would have become bound by the terms of its blank, standard subcontract, which was provided to PNA during the bidding process. (Docket #23 at 19). This is because the bid states that "[e]ach bid shall be based on using the Standard CG Schmidt Subcontract. The bidder must accept all terms of the Subcontract as a condition for submitting a bid." (*See* Docket #23 at 8, 19). The subcontract provided to PNA at the bidding phase was blank. (See Docket #15 Ex. 1 at 72). Beyond the fact that the subcontract requires execution to be effective (*see* Docket #15 Ex. 1 at 71-74 regarding "review" and "execution" of the subcontract), the blank subcontract in the Manual, in and of itself, does not reflect an agreement regarding material terms. Moreover, without essential components of the "Subcontracts Documents" in place (*i.e.*, the prime contract and the GMPA), the Court does not find CGS's argument persuasive. After all, CGS was precluded from entering into a subcontract without the prime contract and GMPA from the outset. (Docket #18 ¶¶ 38-41).

[19]PNA's bid may have constituted a "firm" offer, under the UCC, though this was never argued by the parties. *See* Wis. Stat. § 402.205. Under Wis. Stat. § 402.205, however, if the bid was a firm offer, it would not have been valid after July 19, 2013. Because the parties did not submit evidence about the precise date of CGS's "award," or argue that PNA's bid was, in fact, a firm offer, the Court will not analyze this point.

of such a contract." Wis. Stat. § 402.204(1).[20] These conclusions are in turn based on: the documents CGS provided to PNA; the negotiations that took place between the parties regarding subcontract's terms (including price, scope, compensation, liability, and remedies); and the fact that CGS and PNA were fully aware that no subcontract could be formed without the Project owner's permission (*i.e.,* without the execution of a prime contract and GMPA). At most, after the award of the curtainwall project the parties came to an agreement to agree on the subcontract's terms.

PNA and CGS do not dispute that they were "working towards a signed contract," with PNA's bid and CGS's standard subcontract being the "basis" for negotiations. (Docket #18 ¶¶ 16,20; Docket #24 Ex. 3 at 80:5-6, 134:16-21). This notion is not unfamiliar with CGS, who admits that, in the real estate development industry, it is common practice for general contractors and subcontractors to enter into written subcontracts outlining the terms of their agreement. (Docket #18 ¶ 1). CGS, in fact, maintains such a policy. (Docket #18 ¶ 2).

The documents provided by CGS to PNA further confirm that it intended to be bound to a superseding subcontract that the parties planned to sign at a later date. First, CGS provided its standard subcontract to PNA in April of 2013 within its Manual, which guided bidders through

---

[20]Likewise, the Court notes that CGS presents no argument supporting its position that the "award" of the curtainwall project constituted a "definite and seasonable expression of acceptance." Neither in CGS's brief, nor its accompanying findings of fact, does it detail the time, place, or manner of the award's communication. Deposition testimony indicates, however, that the selection of PNA's bid was communicated verbally to PNA a "couple of months" later. (Docket #24 Ex. 3 at 78:1-21). Disregarding this lack of specificity regarding CGS's purported award, a review of the parties' words, communications, and conduct reveals that neither PNA nor CGS manifested an intention to be bound to the bid.

the bidding process. (Docket #18 ¶ 10). Thereafter, CGS again provided a copy of the standard subcontract to PNA in September of 2013 as the "basis" for contractual discussions. (Docket #18 ¶ 15-16). In sweeping terms, the standard subcontract makes plain that the bid would not be the final expression of the parties' bargain. (Docket #15 Ex. 1 at 74). Instead it was the "[t]he *Subcontract Documents* [that would] form the entire and integrated agreement between the parties and supersede all prior bidding, proposals, negotiations and/or agreements, written or oral, between Subcontractor and CGS….". (Docket #15 Ex. 1 at 74) (emphasis added). Though not exchanged until February, well after CGS selected PNA as the subcontractor of choice, CGS's LOI also reiterates this point. (Docket #18 ¶¶ 24, 30). ("Upon execution of the Subcontract…the Subcontract…shall supersede in all respects prior negotiations…including this letter of intent.").

The parties' conduct likewise demonstrated that they were actively negotiating the terms of a subcontract. As early as May of 2013, PNA made clear that it would not engage in discussions about the subcontract without viewing the prime contract between CGS and the Project owner. (Docket #18 ¶ 15). As PNA acknowledged in its May 2013 email, the prime contract was highly relevant because CGS's standard subcontract incorporated the prime contact by reference. (Docket #18 ¶ 15; *see also* Docket #15 Ex. 1 at 74). What is more, CGS expressly communicated to PNA that it would not, and indeed could not, enter into a subcontract before getting the Project owner's permission. (Docket #18 ¶¶ 34-37). Both the prime contract, and the GMPA, had to be in place before the parties executed their agreement. (Docket #18 ¶¶ 34-37). With this understanding in mind, the parties continued fine tuning the terms of the curtainwall project.

The price tag on the project changed on at least three separate occasions after the initial bid. This was unsurprising, as from the outset, PNA's bid provided CGS with "alternate" materials that would lower the cost of the curtainwall project. (Docket #25 Ex. 2 at 7). CGS actively engaged with PNA in this "value engineering" process to lower the financial burden of the curtainwall. (Docket #18 ¶¶ 12-13). For example, following PNA's bid (which valued the project at approximately $12.7 million) the contract price dropped to approximately $7.7 million in the LOIs, raised back up to approximately $8 million in PNA's Updated Bid Proposal, and then dropped back down again to approximately $7.8 million in the June subcontracts. (Docket #25 Ex. 2 at 3; Docket #15 Ex. 8 at 2; Docket #18 ¶ 31; Docket #24 Ex. 29 at 3; Docket #18 ¶ 67; Docket #18 ¶ 71). These changes in the curtainwall's price reflected the parties' ongoing negotiations over the materials and scope of the project. (Docket #18 ¶ 12-14).

While the intent-to-contract inquiry under the UCC does not hinge on an agreement over the price term, *Ryan v. Wersi Elecs. GmbH & Co.*, 3 F.3d 174, 180 (7th Cir. 1993), this was just one of many consistent interactions between PNA and CGS that demonstrated that the parties did not consider themselves bound until an executed subcontract was in place. For example, in various email correspondence, beginning in May of 2013 and lasting until disengagement, PNA communicated that it did not find various compensation, liability, and remedial aspects of CGS's standard contract acceptable.[21] (Docket #18 ¶¶ 15, 21-22, 47, 52-53, 55, 64). PNA told CGS that

---

[21]Specifically, PNA relayed its concerns about payment terms, compensation for delay, the order of document precedence, remedies in the event of nonpayment, and limitations of consequential, direct or similar damages, and duration and the form of bonds. (*See* Docket #18 ¶¶ 15, 20).

it could not move forward with the project and sign an agreement that permitted open ended liquidated damages and wanted to add contract language regarding liability for delay damages. (Docket #18 ¶¶ 53, 55). Additionally, in light of the standard subcontract's incorporation by reference of the prime contract, PNA reiterated its specific concerns regarding that agreement.[22] (Docket #18 ¶¶ 15, 21-22, 47). Because of PNA's interest in the terms and effect of the Project owner's contract, CGS was put on clear notice, as early as May of 2013, that PNA did not consider itself bound to a yet unknown, and unknowable, prime contract.[23] See *Ziolkowski v. Caterpillar Inc.*, 996 F.2d 1220 (7th Cir. 1993) ("Even if the parties did agree on all fundamental terms, it is beyond dispute that they did not intend to be bound to the oral agreement….Until they settled on written terms, then, they only had an agreement to agree, not a valid oral contract."); *Gruen Indus., Inc.*, 608 F.2d at 279.

What is more, CGS knowingly and actively participated in ongoing negotiations about pricing and other subcontract terms. Not only did CGS engage in the "value engineering" process to lower the price of the curtainwall throughout the spring and fall of 2013, but it also expressly communicated to PNA that it was "not prepared to write a subcontract" based upon the award. (Docket #18 ¶¶ 12-14, 19). CGS acknowledged PNA's issues with the subcontract and invited PNA to "discuss any concerns" that

---

[22]These concerns centered on similar items, including document precedence, compensation for delay, notice of delay, mark up on change orders, and bonds.

[23]Despite PNA's initial request in its May 2013 email to see the prime contract (or a redacted version thereof), CGS did not execute that document, or provide it to PNA, until May of 2014. (Docket #18 ¶¶ 15, 48-49). The GMPA, likewise, was not executed until May 27, 2014. (Docket #18 ¶ 34).

it had with the agreement's proposed language. (Docket #18 ¶ 20). Thus, the undisputed facts show that the parties only manifested an intent to bound to a later writing, which was never signed. This agreement to agree is unenforceable as a matter of law, and PNA is, therefore, entitled to summary judgment. *See Skycom Corp.*, 813 F.2d at 814; *see also* Ziolkowski, 1993 WL 230140, at *1.

CGS relies heavily on an unpublished Seventh Circuit decision, *Associated Milk*, which, in its view, supports its conclusion that CGS and PNA became bound by virtue of their conduct.[24] (Docket #23 at 6-8). In *Associated Milk,* a milk supplier sued a milk processor for failing to pay for milk at a particular price. *Associated Milk*, 27 F.3d at 269. For approximately twenty years prior, the plaintiff transported milk to defendant's milk processing plant at a price set by a complex formula based on regional and federal standards. *Id.* The plaintiff also leased a processing facility in Platteville, Wisconsin, and its operations, to the defendant. *Id.*

When a dispute about pricing began, the defendant terminated the lease of the Platteville facility, and the plaintiff assumed its operations. *Id.* at 270. Though the parties did not sign a new contract during this three-month dispute, the plaintiff ultimately began to sell its milk at the fee the defendant requested, known as the "Super pool" price. *Id.* The plaintiff sued to recover

---

[24]It is unclear whether CGS's arguments under *Associated Milk* applies only to the contract that was purportedly formed under the bid, the LOI, the Updated Bid Proposal, and/or the proposed June subcontracts. (See Docket #23 at 6-8). Since the discussion of that case is not within the context of any of the subheadings that analyze these documents, the Court will address this point at the current juncture, as CGS devotes the majority of its breach of contract argument to the initial bid. (Docket #23 at 6-8).

lost profits from the difference between the prior (more expensive) pricing scheme and the "Super pool" price. *Id.*

Although the parties' writings alone did not form a new contract, the Seventh Circuit concluded that the ongoing shipment and receipt of milk sufficed to evidence a binding agreement at the new "Super pool" price. *Id.* Interpreting the same UCC provisions as are relevant in this case, the court reiterated that "*if* the parties intend a contract, their conduct may create such an agreement, even if certain terms are left open or the moment a contract takes effect is unclear." *Id.* at 271 (emphasis added). While acknowledging that the mere fact that goods are shipped/received was not itself dispositive on the contract formation inquiry, the defendants had "specifically repudiated the parties' course of dealing with respect to price," and the plaintiff nonetheless continued to sell milk at the defendant's price. *Id.* at 274. Moreover, the plaintiff had also acknowledged the defendant's intent to form a new contract by accepting the defendant's lease termination and all of the operations related to it. *Id.* In sum, the Court found that the parties had formed a new contract because the plaintiff and defendant had objectively manifested an intent to be bound to the "Super pool" price. *Id.*

The situation between CGS and PNA is entirely different from the parties in *Associated Milk*. First, while the shipment and receipt of goods is not the *sine qua non* of a contract, the court relied heavily on this aspect of the parties' interaction because it defined the essential terms of the milk supplier's agreement: the items to be sold, quantity, price, delivery, and compensation terms. *Id.* The court found strong evidence in favor of contract formation because the plaintiff provided milk to the defendant, without any objection about price, for over two months, despite the defendant's warning that it would not pay more than the "Super pool" rate. *Id.* at 271. PNA and

Case 2:14-cv-01553-JPS   Filed 10/23/15   Page 32 of 48   Document 28

CGS, on the other hand, had not begun an exchange of goods, or money, prior to the disengagement. In terms of materials, the most that PNA provided to CGS were glass samples and preliminary shape drawings. (Docket #22 ¶¶ 41, 56). PNA, in fact, was explicit insofar as it would not move forward with the submission of shop drawings until the parties executed a contract.[25] (Docket #18 ¶ 25). Regarding the financial aspect of the project, PNA had quoted CGS a figure of $600,000.00 of "Initial Breakout Costs" to begin "design engineering, costs to date,[] to [r]elease dies for fabrication…[and] all production engineering and shop drawing preparations." (Docket #22 ¶ 51). However, the facts do not state that any money was ever billed, or received, by CGS, and CGS's own executives acknowledged that PNA had only been authorized to proceed with work that was "limited in scope" in terms of the entire curtainwall project. (Docket #21 ¶ 4).

CGS maintains that through the course of various meetings, one which was called a "kick-off," the parties' conduct evidenced an intent to be bound and proceed on the project.[26] (Docket #22 ¶¶ 28, 40). However, at none of these meetings did CGS or PNA indicate a contrary intent from that which was expressed in CGS's standard subcontract, namely that the parties would only become bound by a final, integrated expression of their bargain.

[25]The parties also dispute whether the preliminary shape drawings were dependent upon PNA's receipt of an executed contract. This fact, however, is immaterial, as PNA was clear that it was indeed the shop drawings, not the shape drawings, that would not be completed without a subcontract in place.

[26]Another shortcoming in this argument is that the purported conduct that evidenced CGS and PNA's intent to bound to the initial bid, namely the "kick-off" meeting, did not occur until almost a year after the bid submission. The Court highlights this fact to reinforce its conclusion: that the parties were in active negotiations from the time of the bid proposal until disengagement.

Moreover, neither before nor after the "kick-off" did PNA deviate from its position that it could not proceed with shop drawings until an executed contract was in place. (Docket #18 ¶ 25; *see also* Docket #18 ¶ 64) ("They [PNA] have not started shop drawings….they have a number of contract issues….[t]hey are holding the shape redone shops as hostage to the contract."). What is more, by the time the parties had the "kick-off" meeting, neither the prime contract nor the GMPA had been signed, thus precluding CGS's ability to be bound by contract to PNA. (Docket #18 ¶¶ 41-42). Whether or not PNA typically participates in "kick-off" meetings before or after contracts are signed is irrelevant. (Docket #22 ¶ 41(a)). The title of this meeting cannot override what had been reiterated between the parties both before and after the "kick-off": CGS and PNA intended to be bound to a subcontract. (Docket #18 ¶¶ 24, 30).

Unlike the defendant's clear repudiation of the contract price and established course of dealing in *Associated Milk*, CGS and PNA had not changed their position regarding the binding nature of the subcontract. Moreover, PNA and CGS were continually and actively negotiating the terms of their future agreement. *Id.* at 272; *see also Lambert Corp. v. Evans*, 575 F.2d 132, 135 (7th Cir. 1978) ("Even if parties agree, point by point, on all the terms of a contract, if they understand that the execution of a formal document shall be a prerequisite to their being bound there is no contract until the document is executed."). Thus, the undisputed facts make clear that, throughout the bidding process and the negotiations that ensued thereafter, CGS and PNA did not manifest an intent to be bound.

### 3.1.4 The Letters of Intent Echoed the Parties' Intent to Bound to a Subcontract

Secondarily, CGS argues that the February and May LOIs formed a binding contract between the parties, which PNA breached when it disengaged from the curtainwall project.[27] (Docket #23 at 10). Although CGS's brief itself concedes that the May LOI was a "revised" version of the February LOI as a result of "further refin[ment]" of the parties' agreement, it maintains that the May LOI represented a sufficient offer that PNA, in turn, accepted by silence. (Docket #23 at 10).[28] This argument must fail.

As a general matter, and particularly in high stakes and complex business interactions such as this, "inferences from silence are [often] perilous." *Coleman v. Interco Inc. Divisions' Plans*, 933 F.2d 550, 552 (7th Cir. 1991). Under Wisconsin law, silence does not generally constitute acceptance of a contract. *Sell v. Gen. Elec. Supply Corp.*, 227 Wis. 242, 278 N.W. 442, 447 (1938). Moreover, "[w]hile the UCC has relaxed the strict regime of offer followed by acceptance as found in the common law, the requirement of a meeting of the minds still exists." *All The Chips, Inc. v. OKI Am., Inc.*, No. 88 C 8373, 1989 WL 157717, at *4 (N.D. Ill. Dec. 28, 1989). Though Wis. Stat. § 402.206 merely requires an acceptance to be communicated "by any medium reasonable in the circumstances," the Court finds that, in light of the

---

[27]CGS, despite applying the UCC, assumes, without discussion, that all of the alleged "contracts" between PNA and CGS would pass muster under the UCC's statute of frauds. This is, after all, a sale of goods for over $500, and thus the UCC statute of frauds applies. *See* Wis. Stat. § 402.201. Because PNA never signed any of the LOIs, this issue is most relevant at the current point in the Court's discussion. As the parties did not brief or raise this issue, the Court will not discuss it at length, though it is a significant, analytical shortcoming with respect to CGS's arguments.

[28]CGS likewise fails to argue how the terms of these successive contracts would be affected by each others' terms.

nature of the documents exchanged between the parties, and after months of negotiations regarding specific contract terms, CGS's assumption that PNA accepted the May LOI by silence was unreasonable. The parties never manifested an intention to be bound to anything other than a fully integrated and executed subcontract. (*See supra* Part 3.1.3).

Most importantly, the plain language of the February and May LOIs makes it abundantly clear that the LOIs were not intended to form binding agreements between CGS and PNA. Both LOIs expressly confirm what the parties actions and communications had already established: CGS and PNA intended to enter into a binding and superseding subcontract. The LOIs stated, "it is the intent of [CGS] and [PNA] to enter into a Subcontract agreement…Upon execution…the Subcontract and its Exhibits shall supersede in all respects prior negotiations between [CGS] and [PNA] including this letter of intent." (Docket #18 ¶¶ 24, 30). In light of this unambiguous language, assuming that PNA would have understood the May LOI to be an offer to contract, which PNA in turn accepted by silence, runs directly counter to the language that CGS used in its letter. The most that PNA would have understood, is that the parties intended to enter into a *subcontract* at a later date. And, that subcontract, *not* the letter of intent, would constitute the binding agreement between them once signed. *See Gruen Indus., Inc.*, 608 F2d at 279 ("A reading of…these statements, however shows nothing more than ongoing negotiations, because the conduct was accompanied by statements making clear that there was no agreement until the negotiations were complete."). Assuming PNA accepted the May LOI as a binding contract, and assuming it was an offer to contract from the outset, was simply unreasonable under Wis. Stat. §§ 402.204-06.

What is more, in response to CGS's February LOI, PNA made clear that the project could not continue without an executed contract in place. (Docket #22 ¶ 25). Specifically, on March 5, 2014, PNA communicated to CGS that the "shop drawing submittal" deadline, set for July 4, 2014, was a hard stop date because "[a]n executed contract [would] need to be in place…for us to proceed with the project." (Docket #22 ¶ 25). Thereafter, the fact that PNA did not offer any specific comment or objection to the May LOI is irrelevant because CGS should not have expected a response from PNA. Unlike the February LOI, where CGS specifically asked for PNA's comments and review (Docket #15 Ex. 8 at 1), CGS did not ask for any comment on the May LOI (Docket #15 Ex. 10 at 1). Moreover, the May LOI was not designed for PNA to sign; it was a vehicle to proceed with preliminary matters, like the provision of mock-up materials and glass samples. (Docket #15 at 1; Docket #22 ¶ 43). Lastly, that PNA was the one who had originally requested the LOI is irrelevant. Over the course of the parties' dealings, CGS and PNA continually reiterated their intention to be bound to a subcontract, not the LOIs.

### 3.1.5 PNA and CGS Stopped Negotiating Short of Signing A Subcontract

CGS's final arguments are that PNA was bound to perform the curtainwall project because the parties formed binding contracts vis-à-vis PNA's Updated Bid Proposal and CGS's proposed subcontracts.[29] (Docket #23 at 11-13). For the reasons outlined above, namely, the parties' manifest

---

[29]CGS also devotes a paragraph to other "miscellaneous" agreements. However, under this heading CGS merely argues that the "kick-off" meeting, exchange of design information, and shape drawings demonstrated performance of the contract and an intent to be bound. As these arguments have already been addressed throughout the Court's Order, they will not be addressed separately.

intention not to be bound until a final subcontract was signed, these arguments also fail.

By the time the Updated Bid Proposal and the June subcontracts were exchanged, CGS had entered into a prime contract and GMPA with the Owner. (Docket #18 ¶¶ 27, 34, 46, 66, 70). However, at no point during the months of May or June of 2014 did PNA or CGS indicate that a subcontract was no longer required to proceed. Additionally, at the time of the Updated Bid Proposal, CGS, through its internal emails, continued to acknowledge that PNA had issues with various aspects of the subcontract. (Docket #18 ¶¶ 52-57). First, PNA was concerned with liquidated damages, liability for delay damages, and damages for delay by others. (Docket #18 ¶¶ 54-55). Moreover, the parties were still in the process of refining the price term for the subcontract, which was approximately $8.47 million in the Updated Bid Proposal (Docket #24 Ex. 28 at 21), and approximately $7.7 million in the June subcontracts (Docket #18 ¶¶ 67, 71). Lastly, it was not until after the Updated Bid Proposal that PNA suggested that the parties work on the "scope specific portion" of the subcontract. (Docket #18 ¶ 56).

Internally, CGS continued to underscore the importance of the signed subcontract. (Docket #18 ¶ 57) ("It will be very important to have the contract signed and sealed by the end of next week at the latest."). CGS acknowledged that PNA had expressed, and continued to express, concerns about the subcontract's terms. (Docket #18 ¶¶ 62, 64-65). Only on June 12, 2014, did the parties eventually exchange draft language regarding an Addendum to the contract. (Docket #18 ¶ 63). Likewise, PNA maintained the position that it communicated to CGS in March of 2013: it could not begin shop drawings until an executed subcontract was in place. (Docket #18 ¶ 64).

Following the exchange of the June 13 and June 16 subcontracts, PNA disengaged from the project. (Docket #18 ¶ 73-78). PNA never signed the proposed June subcontracts. (Docket #18 ¶ 68, 72).

On a final note, the Court acknowledges that CGS argues that the reason for PNA's disengagement is somehow relevant to whether it did, in fact, breach an alleged contract between the parties. (Docket #23 at 12). While PNA's motivation for the disengagement may be relevant to a more policy-based inquiry, like that of promissory estoppel (*see infra* Part 3.2.2), CGS's argument is based on a false premise: that the motivation for an alleged "breach" is somehow relevant to whether there existed a contract in the first instance. The Court rejects CGS's argument. The issue in this case is whether PNA and CGS ever formed a contract. It goes without saying that this inquiry turns on events that happened *before* PNA allegedly breached a contract with CGS.

In conclusion, PNA and CGS, through their written and oral communications, manifested a mutual understanding regarding their agreement to agree: they intended to enter a subcontract that would "integrate" and "supercede" all of their negotiations. Despite these protracted negotiations, CGS made clear that the parties could not be bound by subcontract until the prime contract and GMPA were executed. While under Wisconsin law, a contract may be formed by conduct, and does not need to be signed to be effective, CGS and PNA, through their own words and actions, expressly manifested an intention *not* to be bound by any bids, agreements, proposals, or negotiations until they signed a written subcontract with the complete terms of their agreement. As there was no final subcontract agreed upon and signed by the parties, PNA did not breach any contractual obligation to CGS and is, therefore, entitled to judgment as

a matter of law. While the question of the parties' intent to contract is often factually based, and therefore more difficult to dispose of at summary judgment, the undisputed facts make clear the parties lacked the requisite intention to be bound, thus making summary judgment appropriate in this case. *See Skycom Corp.*, 813 F.2d at 814.

### 3.2 Promissory Estoppel

#### 3.2.1 The Elements

Promissory estoppel is an equitable doctrine "intended to protect parties that have not entered into a contract, but nonetheless incurred damages acting in reliance on a promise made by another party." *Knauf Realty, LLC v. Prudential Real Estate Affiliates, Inc.*, 486 F. Supp. 2d 855, 861 (W.D. Wis. 2007) (citing *Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 696, 133 N.W.2d 267, 274 (1965)). Interpreting Wisconsin law, the Seventh Circuit breaks down the claim into four elements: (1) a promise; (2) on which the promisor should reasonably expect to induce action or forbearance; (3) which does induce such action or forbearance; and (4) that injustice can be avoided only by enforcement of that promise. *Id.* (citing *Beer Capitol Distrib., Inc. v. Guinness Bass Import Co.*, 290 F.2d 877, 880 (7th Cir. 2002)). Generally, the first three elements of an estoppel claim are determined by a fact finder, while the fourth element is decided by the Court. *See Seater Const. Co. v. Rawson Plumbing, Inc.*, 2000 WI App 232, ¶ 20. Where there is no genuine issue of material fact, therefore entitling a movant to judgment as a matter of law, summary judgment is appropriate. *See e.g.*, *Gruen Indus., Inc.*, 808 F.2d at 282; *T & M Inventions, LLC v. Acuity Brands Lighting, Inc.*, No. 12CV0091, 2013 WL 1754862, at *9 (E.D. Wis. Apr. 23, 2013); *Ziolkowski v. Caterpillar, Inc.*, 800 F. Supp. 767, 782 (E.D. Wis. 1992) *aff'd*, 996 F.2d 1220 (7th Cir. 1993); *Knauf Realty, LLC*, 486 F. Supp. 2d at 861.

CGS relies on the fact that the doctrine of promissory estoppel has found frequent application within the context of general contractor and subcontractor disputes. (Docket #23 at 14-15). In support, CGS cites the seminal case, *Drennan v. Red Star Paving Company*, which explained that the "very purpose of [promissory estoppel] is to make a promise binding even though there was no consideration in the sense of something that is bargained for and given in exchange. Reasonable reliance [on behalf of the general contractor] serves to hold the [subcontractor] in lieu of the consideration ordinarily required to make the offer binding." 51 Cal. 2d. 409, 333 P.2d 757, 760 (1958) (internal citations omitted).

While the Seventh Circuit has, under appropriate circumstances, likewise found promissory estoppel applicable to general contractor and subcontractor disputes (*see e.g.*, *Janke Const. Co. v. Vulcan Materials Co.*, 527 F.2d 772, 779 (7th Cir. 1976)), it has likewise acknowledged that the doctrine serves a "gap-filling" purpose. *Al-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869-70 (7th Cir. 1999). The doctrine is not "designed to give a party…a second bite at the apple in the event it fails to prove a breach of contract." *Id.* (international citations omitted). Moreover, plaintiffs cannot rely on the claim "to transform complex negotiations into a 'no lose' situation for themselves." *T & M Inventions, LLC,* 2013 WL 1754862, at *9. After all, "[e]very businessman faces the risk that the substantial transaction costs necessary to bring about a mutually beneficial contract will be lost if the negotiations fail to yield a satisfactory agreement." *Gruen Indus., Inc.*, 808 F.2d at 282.

### 3.2.2 PNA Is Not Liable to CGS Under the Doctrine of Promissory Estoppel

A "promise" for purposes of promissory estoppel is a "manifestation of intent by the promisor to be bound, and is to be judged by an objective

standard." *Major Mat Co v. Monstanto Co.*, 969 F.2d 579, 583 (7th Cir. 1992) (citing Restatement (Second) of Contracts § 2 cmt b). "The critical requirement is the promise be one that the promisor should reasonably have expected to induce either action or forbearance by the plaintiff." *Knauf Realty, LLC*, 486 F. Supp. 2d at 861 (quoting *U.S. Oil Co. v. Midwest Auto Care Services, Inc.*, 150 Wis.2d 80, 89 (Ct. App. 1989) (internal quotations omitted)).

As discussed above, the Court finds that the undisputed facts demonstrate that CGS and PNA did not objectively manifest an intent to be bound prior to the signing of a subcontract. (*See supra* Part. 3.1.3). In light of the Court's lengthy analysis on this topic, it will not belabor the same points here. For present purposes, it suffices to say that the Court does not find that PNA's bid was sufficient to ground the first element of promissory estoppel in light of the parties' manifest intent to be bound to a fully integrated and superseding subcontract, which was never signed. *See e.g.*, *Knauf Realty, LLC*, 486 F. Supp. 2d at 862.

Regarding the second element of promissory estoppel, even if PNA's bid was sufficient to constitute a "promise," the Court concludes that any reliance on PNA's bid was unreasonable under the circumstances. *See e.g.*, *Gruen Indus., Inc.,* 608 F.2d at 279-80; *T&M Inventions, LLC.* 2013 WL 1754862, at *9 ("[T]he communications between the parties…tell a…story…in which the parties knowingly engaged in extended negotiations, exchanging numerous drafts and proposals. As such, to the extent the plaintiffs detrimentally relied on any promises made by the defendants, such reliance was not commercially reasonable."); *Ziolkowski*, 800 F. Supp. at 783 (finding it unreasonable to rely on an alleged promise when "[a] formal written contract was intended by both parties").

The undisputed facts reveal that, from May of 2013 until June of 2014, the parties were actively negotiating the terms of their agreement. (Docket #18 ¶¶ 15, 55). On the one hand, CGS argues that all of the essential terms were agreed upon by the parties. (Docket #21 ¶ 59). On the other hand, it does not dispute the underlying facts regarding the negotiations. (Docket #21 ¶¶ 12-14, 20, 22, 24, 30, 52-56). Reflecting the ongoing nature of negotiations between the parties, the undisputed facts show that the price for the subcontract changed at least three times after PNA's initial bid, and ranged from approximately $12 million to $7.7 million. (Docket #25 Ex. 2 at 3; Docket #15 Ex. 8 at 2; Docket #18 ¶ 31; Docket #24 Ex. 29 at 3; Docket #18 ¶ 67; Docket #18 ¶ 71). In addition, from May of 2013 until June of 2014, PNA expressed concerns related to various subcontract provisions, including, but not limited to, the order of precedence of documents, remedies for nonpayment, compensation terms, damages and liability, and bonds. (Docket #18 ¶¶ 15, 22-23, 53, 55). Even CGS's executives acknowledged that many of PNA's subcontract concerns remained unaddressed in June of 2014. (Docket #18 ¶ 64).

Moreover, CGS and PNA were both fully aware of multiple contingencies that could have prevented the signing of a subcontract in the first instance. Specifically, the parties were waiting for permission to sign a subcontract from the Project's owner. (Docket #18 ¶¶ 19, 37-41). It was not until late May of 2014 that these agreements were even in place. (Docket #18 ¶¶ 27, 34). With these contingencies in mind, the Court not only doubts that the bid could have been "reasonably understood as legally enforceable" *Garwood Packaging, Inc. v. Allen & Co., Inc.*, 378 E.2d 698 (7th Cir. 2004), but also conclusively finds that it was commercially unreasonable to rely on such a "promise." *See Gruen Indus., Inc.*, 608 F.2d at 281 (upholding summary

judgment for defendants on a promissory estoppel claim after finding that an alleged promise could "have failed on the basis of the many contingencies").

CGS argues that PNA should have reasonably expected to induce CGS to action, *i.e.,* incorporating PNA's bid into the prime contract. (Docket #23 at 18-19). PNA, after all: (1) knew that CGS "would depend on [PNA] to honor [its] bid if [CGS] carried [PNA's] number in their quote to the owner" (Docket #22 ¶ 13); (2) never warned CGS about the disengagement (Docket #22 ¶ 62); and (3) allegedly misrepresented that it was available to work on the curtainwall at the time it submitted the Updated Bid Proposal (Docket #23 at 19).[30] In addition, CGS argues that, in analyzing a claim for promissory estoppel under *Janke,* there is "no factual analysis necessary [for the reliance element of promissory estoppel] beyond simply confirming that a subcontractor's bid was served and awarded." (Docket #23 at 19).

On the one hand, PNA's Senior Vice President, Mr. Kneeland, testified that, as an experienced subcontracting company, PNA "when signing a bid form understand[s] that the general contractor…may reasonably rely on the price being offered in the bid when the general contractor furnishes a commitment to a price to the owner…" (Docket #22 ¶ 15).[31] While this may be true as a matter of general practice, PNA and CGS were both fully apprised of the complex circumstances that delayed the execution of their subcontract. (Docket #18 ¶¶ 34-42). Ultimately, as CGS itself concedes, the real estate development industry is "unique" and often involves the

---

[30]This fact is undisputed, though PNA objected to this testimony as speculation.

[31]This fact is undisputed, though PNA objected to this testimony as speculation.

coordination of multiple interested parties. (Docket #23 at 8). It is therefore untenable, with this knowledge in mind, for CGS to assume it was bound and could rely on PNA's bid throughout the course of fourteen months of negotiations.

While PNA's continued involvement in the curtainwall project, despite knowledge about civil unrest in Thailand, is relevant to whether "justice" requires enforcement of the bid, the Court finds that these facts do not bear on the reasonableness of CGS's reliance for two reasons. First, the undisputed facts do not indicate that CGS was definitively aware of the unavailability of GAT II for production. Rather, as late as February of 2014, "the GAT2 budget [was] just approved, [and] end of the year start assembly [was] a perfect timing." (Docket #22 ¶ 32(a); Docket #24 Ex. 19 at 1). Moreover, even if GAT II had not been available, PNA executives had expressed early on the possibility of moving production to Manila or increasing GAT II's staff. (Docket #24 Ex. 20). Thus, it appears that any potential "warning" from PNA about the availability of GAT II would have been either premature or wholly unnecessary. Second, at no time did CGS or PNA express a contrary intention than to be bound by an executed subcontract. Thus, as the parties should have been objectively aware of their status as negotiating business partners until a subcontract was signed, PNA's obligation to warn was not required.

Lastly, CGS's reliance on *Janke* is misplaced. The defendant in that case "intentionally and successfully represented to Janke" that it would supply the pipe "as indicated" on the plan specifications for a real estate development. *Janke Const. Co., Inc v. Vulcan Materials Co.*, 527 F.2d 772, 779 (7th Cir. 1976). However, the plaintiffs were men of "limited formal education and with no engineering background or technical experience." *Id.*

Thus, when the plaintiffs discovered that the defendant's bid was based on a non-specific piping material, which made the subcontract vastly more expensive, the court found promissory estoppel appropriate. *Id.* As a result of the parties' business deal, the plaintiffs lost approximately $40,000. *Id.*

Ultimately, *Janke* is most relevant to the second and third elements of CGS's promissory estoppel claim. Regarding the reasonableness CGS's reliance on the bid, the Court finds that CGS and PNA were in significantly different positions from the parties in *Janke*. First, PNA and CGS were actively negotiating the terms of a subcontract that would "supersede" all bidding, proposals, negotiations, and prior agreements made between them. (Docket #15 Ex. 1 at 74). In fact, it was CGS's own documents that first established that the parties' agreement would be fully integrated and governed by a signed subcontract. (Docket #15 Ex.1 at 74; Docket #18 ¶¶ 24, 30). Second, CGS is a sophisticated and experienced contractor that maintains a policy of signing subcontracts with all of its subcontractors. (Docket #18 ¶¶ 1, 2). It was not bargaining from a position of lesser knowledge, or vulnerability, like the plaintiffs in *Janke*.

Regarding the third element of promissory estoppel, the Court notes that CGS has not apparently suffered any detrimental reliance based on PNA's bid. *Skycom*, 813 F.2d at 817 ("[A] promise that is designed to induce commercially reasonable detrimental reliance will be enforced *to the extent necessary* to compensate the relying party for his injury in relying.") (emphasis added). Unlike the plaintiffs in *Janke*, who took a significant financial hit after Vulcan disengaged, CGS does not set forth any facts whatsoever showing that it incurred any financial harm or injury after PNA disengaged. CGS merely states that it was "forced…to replace PNA with another curtainwall subcontractor who agreed to an accelerated schedule

and installation costs in amounts excess to PNA's most recent proposal…." (Docket #22 at 68). However, CGS is still unable to estimate the cost of the replacement subcontractor because the curtainwall project is not yet completed. (Docket #26 ¶ 68). Moreover, CGS is covered by a contingency fund established under the GMPA, which may act to cover any differences between the actual and anticipated curtainwall budget. (Docket #26 ¶ 68). Thus, it appears that CGS is yet unaware of whether Glass Solutions' curtainwall will cost more than PNA's bid. And, even if CGS's contract with Glass Solutions runs over budget, CGS may not suffer any financial detriment at all. In sum, CGS merely alleges an anticipated detriment to having relied on PNA's bid, not an actual one.

Finally, justice does not require the enforcement of PNA's bid. At bottom, both CGS and PNA were experienced actors in the commercial real estate industry and were operating within a context of complex negotiations that involved contingent third party agreements. (Docket #18 ¶¶ 37, 41). Both parties were sophisticated business entities and there is no indication that this is a situation where "one party with superior knowledge took advantage of the other party." *Gruen Indus., Inc.*, 608 F.2d at 282.

In conclusion, the Court finds that both CGS and PNA knew that a signed subcontract would form the final and full expression of their agreement. Because CGS was bargaining with PNA in full knowledge of these facts, CGS did not reasonably rely on PNA's bid, did not incur any detriment as a result thereof, and justice does not require enforcement of PNA's bid. The Seventh Circuit is clear: plaintiffs cannot use promissory estoppel into a "no lose" situation. *T & M Inventions, LLC.*, 2013 WL 1754862, at *9. Thus, the Court finds that "the losses are best left where they have fallen…." *Gruen Indus., Inc.*, 608 F.2d at 282.

3. CONCLUSION

The undisputed material facts establish that neither CGS nor PNA manifested an objective intention to be bound by contract prior to signing a subcontract, which was contemplated to be the final expression of their bargain for a curtainwall. The extent of the parties' agreement was an agreement to agree to a future subcontract, which was never signed. As no subcontract resulted from the parties' negotiations, CGS's breach of contract claim must fail as a matter of law. Moreover, in light of these undisputed facts, it was unreasonable for CGS to rely on PNA's bid, CGS has not incurred any financial harm, and justice does not require the bid's enforcement. PNA is entitled to judgment as a matter of law on both the breach of contract and promissory estoppel claims.

Accordingly,

IT IS ORDERED that the defendant's motion for summary judgment (Docket #16) be and the same is hereby GRANTED, as more fully described in detail above, and that this action be and the same is hereby DISMISSED on the merits together with such costs as may be taxed by the Clerk.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 23rd day of October, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge